95  289
99  145
95  289
101  475

95  289
112  721

95  289
119  295
119  299
e119  301

CASE 49—PETITION EQUITY—FEBRUARY 8.

# Schmidt, Trustee, v. Louisville & Nashville Railroad Company.

APPEAL FROM LOUISVILLE LAW AND EQUITY COURT.

1. RAILROADS—PLEDGE OF "NET EARNINGS" ACCRUING TO LESSEE ON ACCOUNT OF BUSINESS COMING "FROM OR OVER" LEASED ROAD.— Where a railroad company leased the unfinished road-bed and all the rights and franchises of another company for a term of years, and the lessor executed mortgage bonds and placed them in the hands of the lessee with which to raise money to complete the leased road, which was intended by the lessee as a "feeder" for its main line, and the lessee pledged for the payment of the interest on the bonds the "net earnings" which might accrue by reason of business "coming to it from or over" the leased road, the lessee thereby put in lien the net earnings not only on the business coming to the main line directly off the leased road, but also on the business received on the main line, and destined to points on the leased road.

2. SAME.—In arriving at the "net earnings" to which bondholders are entitled for the payment of interest on their bonds, there should be deducted from the gross earnings accruing to the lessee from business coming to it on account of the leased road not only the cost and expense of handling this particular business, but a porportionate part of the total operating expenses of the company. But the losses incurred by the lessee in operating the leased road are not to be deducted from the net profits which the lessee made on its own lines from the business coming to it from the leased road, or such net profits are not to be applied to the payment of those losses before paying the interest on the bonds.

3. INTEREST.—The earnings as they are ascertained in the approved report of the commissioner should bear interest from the time they

Vol 95—19

should have been applied under the contract in payment of the interest on the bonds.

SIMRALL & BODLEY for appellants.

1. Our contract is not that we shall have the net earnings of the Louisville, Cincinnati & Lexington Railway Company on business coming to it from or over the Cumberland & Ohio road after it has been thrown into hotch-potch with the business of the Louisville & Nashville Railroad and borne a proportion of the general expenses of the entire system. Neither is it that we shall have what is left of said net earnings after there has been deducted therefrom a certain proportion of *all the expenses and all the losses* which the Louisville, Cincinnati & Lexington Railway Company has incurred *on all its business*. But our contract is for *all the net earnings* which the Louisville, Cincinnati & Lexington Railway Company may make out of this *particular business*, and the additional cost or expense of handling that *particular business*. (Union Pacific Railway Company v. United States, 9 Otto, 420; Cochran & Fulton v. Atherton, 11 Ky. Law Rep.)

The case of Pullan v. C. & C. Air Line R. Co., 5 Biss., 245, explained.

2. We are entitled to the net earnings both ways. The word "coming" does not carry with it necessarily the idea of physical motion, and as here used it does not mean the opposite of going, but it *means arising or accruing* to the Louisville, Cincinnati & Lexington Railway Company by reason of business coming to it from or over the Cumberland & Ohio road. (Shippen v. Izord, 1 S. & R. (Pa.), 224.)

3. The net earnings of the Louisville, Cincinnati & Lexington *on its own lines* can not be applied to pay its losses on the Cumberland & Ohio.

HELM & BRUCE. for appellee.

1. The lease and mortgage are to be considered as one, and the holder of each of the mortgage bonds was affected with knowledge of all the provisions of the lease which was duly recorded in the proper counties. (Gammon v. Freeman, 31 Me., 243; R. & B. R. Co. v. Crocker, 29 Vt., 240; Pike v. Cook, 3 Bush, 163; Mueller v. Engler, 12 Bush, 441.)

2. The appellee's obligation to the holders of bonds on the Northern Division of the Cumberland & Ohio Railroad Company does not arise until the operating expenses on the Cumberland & Ohio Northern Division are paid.

3. Appellee's obligation to the bondholders only affects the business originated by the Cumberland & Ohio Northern Division, and delivered by it to the appellee—in other words, business going one way.

4. The whole of the business passing between points on the two lines was of a local character, and not through business, and the cost of doing

this business was very much in excess of the average cost of the whole business done on the lines of the appellee, and the report of Mr. Sewell, in which he estimated the cost of doing this business as no greater than the average cost of doing the whole business, is incorrect for that reason.

The court is referred to the following cases on the subject of how net profits are ascertained: St. John v. The Erie Railroad Co., 22 Wall., 136; Union Pacific R. Co. v. United States, 99 U. S., 420; Tapt v. Railroad, 8 R. I., 310: Belfast & Moosehead Lake R. Co. v. Belfast, 23 Am. and Eng. R. Cases, 740; Bates v. A. R. Co., 49 Me., 491; United States v. Kansas Pacific R. Co., 99 U. S., 455; Pullan v. C. & O. R. Co., 5 Biss., U. S. C. C., 237.

5. The receipts of the two roads from business passing over both should be distributed in accordance with the almost universal custom of allowing the short road an arbitrary proportion of the earnings.

JUDGE HAZELRIGG DELIVERED THE OPINION OF THE COURT.

In 1879, the Northern Division of the Cumberland & Ohio Railroad Company leased to the appellee, the Louisville, Cincinnati & Lexington Railway Company, for the term of thirty years, its unfinished road-bed, rights of way, with improvements and appurtenances, depots and depot grounds, machinery, tools and implements, together with all its property rights and franchises, belonging to or in any way appertaining to its line of railway at the town of Eminence, Kentucky, thence running southwardly through the Counties of Henry, Shelby and Spencer, and terminating at Bloomfield in the County of Nelson.

In this lease, the first-named company agreed to mortgage to the appellee all its property, rights and franchises belonging to or in any way appertaining to its line of railway as described above, to secure the payment of three hundred and fifty bonds of one thousand dollars each with coupons attached, to run for a term of years. The number of these bonds was subsequently reduced to two hundred and fifty. These bonds were to be put in the hands of the appellee to be sold, and the proceeds

applied to the construction of the Cumberland & Ohio
Railroad, and if there were any deficiency to complete
the road from Shelbyville to Bloomfield, the appellee was
to supply it and have a second lien therefor on the road.
After such construction, the appellee was to operate
the road under the lease for thirty years, and apply the
net earnings derived therefrom to the payment of interest
on the bonds indicated, and to the creation of a sinking
fund for their retirement.    To this end, the lessee was to
make to the lessor quarterly returns, giving full details
of earnings and operating expenses, including the expense
of keeping the road-bed in order.   Out of the gross earn-
ings was first to be deducted annually the sum of one
thousand dollars to be paid to the lessor with which to
keep up its organization; and, if the net earnings did
not prove sufficient to pay the interest and provide for
the sinking fund on the mortgage bonds, then the lessee
(appellee)—if all other sources of raising money failed the
lessor—was to supply the deficiency as far as might be
done by appropriating the net earnings, or so much as
might be needed on its own lines, which might accrue by
reason of business coming to it from or over the lessor's
lines.   The construction of the road from Shelbyville to
Eminence was abandoned because the appellee had
obtained a long lease of the Shelby Branch road which
connected with its own lines at Anchorage, thus connecting
the contemplated road of the lessor with its own road,
and making it a "feeder" therefor.   The sale of these
bonds depended on the plan adopted for the prompt pay-
ment of the interest, and in order that this might be met
promptly, the appellee agreed to pay it during the con-
struction of the road, and then, as we have seen, see to

its payment out of the earnings indicated.    The appellee at the start contemplated giving an absolute guaranty of the payment of this interest, but upon the advice of its attorney that it had no power to do so, it executed the following mortgage on the earnings pledged in the lease heretofore described:

"That, whereas, by authority of an act of the General Assembly of the Commonwealth of Kentucky, approved the 18th day of March, 1878, the party of the first part has entered into a contract with the Northern Division of the Cumberland & Ohio Railroad Company for the lease, construction and operation of the latter company's line of road from Eminence, in Henry County, Kentucky, through a part of said county, and the Counties of Shelby and Spencer, and into Nelson County, so far as Bloomfield, all in the State of Kentucky; said lease to continue for thirty years upon the terms therein set out, in which it is stipulated by and on behalf of said first party herein, that if the net earnings of said leased premises do not prove sufficient to pay the interest and provide for the sinking fund of three hundred and fifty bonds of one thousand dollars each, bearing interest at the rate of seven per cent per annum, payable half yearly on the first days of June and December, and having twenty years to run from the 2d day of July, 1879, to be issued by said Northern Division of the Cumberland & Ohio Railroad Company; and if all the sources of raising money of said Northern Division of the Cumberland & Ohio Railroad Company fail to provide for said interest and sinking fund, then said first party herein should supply the deficiency so far as the same may be done by appropriating the net earnings, or so much thereof as

may be needed on its own lines, which may accrue to it by reason of business coming to it from or over the said lines of the said Northern Division of the Cumberland & Ohio Railroad Company, and whereas said contract of lease has been fully consummated by action of the stockholders of the first party herein, and it is now desired to carry into effect the said stipulation as to said net earnings.

"Now, in consideration of one dollar cash in hand paid by said second party to said first party, and the premises, the said first party has this day and does hereby mortgage and put in lien all net earnings which may accrue to it by reason of business coming to it from or over said lines of the Northern Division of the Cumberland & Ohio Railroad Company to the said Joshua F. Speed, as trustee aforesaid (who is the trustee for the mortgage made by said Northern Division of the Cumberland & Ohio Railroad Company to secure said three hundred and fifty bonds, of one thousand dollars each), conditioned that if the net earnings of said leased premises do not prove sufficient to pay the interest and provide for the sinking fund of said mortgage bonds, then said first party, if all other sources of raising money of said Northern Division of the Cumberland & Ohio Railroad Company prove insufficient, will supply the deficiency so far as it may be done by appropriating and paying over promptly the net earnings, or so much thereof as may be needed on its own lines, which may accrue by reason of business coming to it from or over said Northern Division of the Cumberland & Ohio Railroad Company's lines for the purpose of discharging said interest and sinking fund as they severally fall due."

In pursuance of the contract of the lease and mort-

gages, these bonds were placed on the market by the appellee and sold at about their face value. No interest having been paid on them since 1883, the appellant, Schmidt, as successor to the trustee named in the mortgage, and the other appellants who were the purchasers of the bonds, instituted this action to compel the appellee to account for the net earnings alleged to have accrued to it by reason of business coming to it from or over said Northern Division of the Cumberland & Ohio Railroad Company's lines for the purpose of paying the defaulted interest and establishing the promised sinking fund with which to retire the principal at maturity. The appellee denied that it has made any profit from the business coming to it from or over the line of the leased road.

The case was elaborately prepared, and after a number of references to, and reports from, special commissioners —experts in the tabulation of figures—and the accumulation of several thousand pages of record, the chancellor finally dismissed the petition.

The appellants contend that the net earnings made on the lines of the appellee, and put in pledge under the lease and mortgage, were the net earnings of business coming to the appellee *from both directions*—that is to say, earnings accruing by reason of business on its own lines, brought to it on account of the building of the new road. The appellee says that it was the intention to put or pledge only the profits of business coming literally from off the new road on to the main line, and this is the first question to be decided.

In his first opinion, the learned chancellor held that the plaintiffs and other holders of the bonds were entitled to the net earnings of the appellee " on business coming

to it from or over the lines of the Northern Division of Cumberland & Ohio Railroad Company in both directions," and the commissioner was directed to ascertain and report the net earnings accordingly. Again considering the question carefully, the chancellor more than a year after his first opinion, "reached the conclusion that the net earnings pledged embrace such as arise from business carried on over said road both ways—going and coming," but in the opinion and judgment appealed from, he comes to a different conclusion. We are of the opinion that his first impressions are correct. Business coming to it "from" the Northern Division of the Cumberland & Ohio means business coming to it by reason of, out of or by aid of the Northern Division of the Cumberland & Ohio. The new road is the source of the business or the cause of the business. The fact that it has been built brings business from Louisville, Cincinnati and Lexington on to the lines of the appellee and over its own line to Bloomfield and other points on the way. It also brings business on its own line to the main line, and it is by reason of the new road and therefore "from" the new road that the business originates.

This construction is in accord with the spirit of the agreement and the purposes in view.

The trunk line wanted a "feeder"; it was willing to give up temporarily all it might earn by reason of the business—all the business—brought to it by the new road for the sake of having a permanent feeder in the future. It might not pledge its own resources—though willing to do so—to the payment of this interest, but it could give up all it made for the time being out of the business created by the new road.

The second question is how are we to ascertain the net earnings in lien under the mortgage?

The gross earnings are given, but from them what shall be deducted in order to show the net earnings?

The appellants say that the appellee being fully equipped with officers, rolling stock and other appliances for operating it roads, should account for the gross earnings received for doing the business brought to it from the Cumberland & Ohio less the cost and expense of handling *this particular business*. That their contract is not that they should have the net earnings of the Louisville, Cincinnati & Lexington Railway Company on business coming to it from or over the Cumberland & Ohio road after it has been thrown into hotch-potch with the other business of the appellee, and borne a proportion of the general expenses of the entire system. Nor is it that they should have what is left of the net earnings after there has been deducted therefrom a certain proportion of all the expenses and all the losses which the appellee has incurred on all its business. But that their contract is for all the net earnings which the Louisville, Cincinnati & Lexington Railway Company may make out of this particular business, which of necessity is the difference between its gross earnings from that particular business and the additional cost or expense of handling that particular business.

Now granting full effect to all counsel say as to limiting or restricting the deduction to be made from the gross earnings in the way of cost for handling this particular business, we fail to understand how we are to arrive at the cost of handling this business. It can not be meant that each shipment of freight, to the profit of shipping

which the appellants are entitled, is to be traced over the
lines of the appellee to its destination, and the cost thereof
sought to be ascertained by some special rule not applica-
ble to shipments of other freight.   Manifestly, the par-
ticular shipments in which the appellants are interested
enjoy no special place or retain no privileged classification
when they come to be mixed with the other shipments of
the main line.   Notwithstanding that the contract con-
trols the final destination of the net earnings of this
freight and gives it to certain designated persons, never-
theless, in what respect, may we ask, does it cost less to
ship a pound of this freight than to ship a pound of any
other freight carried over the appellee's lines?

It is said that the appellee would have carried this gen-
eral freight anyway, and been to the cost of doing so
whether it carried this particular freight or not; but this
can be said of every pound carried on the train, and besides
it is not true that the appellee could have done the busi-
ness thus coming to it from the Cumberland & Ohio with-
out additional cost.   But it is to find this additional cost
that we are called on to adopt some just rule.

There is nothing in the mortgage which prescribes the
method of ascertaining these net earnings.   They are
therefore to be arrived at in the usual way.   The ship-
ments in question must be subjected to a like cost of
transportation as falls on other business.   From the gross
receipts must be deducted the cost of producing them.
The traffic from the Cumberland & Ohio is solicited by
the usual methods of advertising, received at the various
depots of the main line, sorted, loaded, transported,
unloaded and delivered.   Counsel admit the existence of
some proper charges against this business, otherwise the

Schmidt, Trustee, v. Louisville & Nashville Railroad Co.

appellee would be held for the gross earnings, but how shall we stop short of letting it bear the same proportion of cost as falls on other business? Why, for example, should a proportion of the cost of additional water supply or fuel be charged against this business and not a proportion of the amount paid for labor on the road? Certainly the more business done, the greater tonnage hauled, the more water, fuel, labor, etc., required, and the greater the wear and tear of the road and rolling stock; and we know of no way to arrive at all this save approximately by a proportion distributing the total operating expenses over the whole business. This process has been approved in many cases. (See St. John v. Erie R. Co., 22 Wall., 136; Pullan v. C. & O. R. Co., 5 Biss., U. S. C. C., 237; United States v. Kansas Pacific R. Co., 99 U. S., 455.) In the first-named case it is said: "The business of the road is a unit. If it had been disintegrated, as proposed by the complainant, we apprehend it would have been found that the correlations of the main stem and the branches were such that the expenses and charges incident to the entire business and those of its several parts were so interwoven and blended that an accurate ascertainment of the net profit of the main line and any of the auxiliaries, taken separately from the rest, would have been impracticable."

It appears from the record, that some eight or ten commissioners' reports have been elaborately prepared and filed seeking to ascertain the net earnings in dispute. The first one (R. E. S. No. 1) ignores the equitable method of distributing the cost of the business in question by proportion, as indicated above, and others reach results by using what is called "arbitraries." Of these we

may say they have no place in this case, by reason of the absence of any agreement to the effect that they may be used. Upon examination of all the reports and the principles underlying them, we are of opinion that the report of Mr. Sewell (R. E. S. No. 2) is a nearer approximation to correct results than any of the others. It estimates the earnings on the appellee's lines in both directions, and finds the net earnings by deducting from the gross receipts the expenses of operating the road by which the receipts are earned. The cost of transportation is ascertained by proportion, and the proper per centage is charged to the business in dispute, all of course, aside from and exclusive of expenditure of capital laid out in constructing and equipping the works themselves. This gives to the appellants the sum of $60,192.27 of net earnings up to the date of the report named. Other reports reduce this sum, although purporting to be based on the same principles; and it may be admitted, that by the exercise of sufficient ingenuity in multiplying the items of expenses attending such a business as that of railroading, the actual earnings of a road may be made to vanish in a maze of mathematical calculation. In addition to the fact that this report (R. E. S. No. 2) shows itself to be the nearest approach to absolutely correct results, its conclusions are approved by the judgment of Baird, Sewell and others who have devoted years of study to the question at hand.

The chancellor finally reached the conclusion that under the contracts in question the net profits which the appellee made on its own lines from the business coming to it from the Cumberland & Ohio road should be applied, not in payment of the interest on the bonds, but in paying

the losses incurred by the lessee and appellee in operating the leased road. Holding, in other words, that there were no net earnings as long as there was a loss in running the leased road. We think this is manifest error. It was to meet this contemplated loss or deficiency that the contract was made, and in express terms directed the net earnings to be applied to the payment of this interest.

The loss accruing to the appellee in this case, if any, arises not out of the pledge of what it makes on its own lines from the business brought to it from the new road, but out of an unprofitable lease of the new road. The appellee had the power to make this unlucky contract of lease though it might not agree to pay this interest.

The results arrived at by the commissioner in the report R. E. S. No. 2 as the net earnings up to the date fixed in the report, are evidently fair and just to all the parties concerned, and this report is approved.

The judgment is reversed, with directions to take the report indicated herein as the basis for further proceedings consistent with this opinion.

---

To a petition for rehearing Judge Hazelrigg delivered the following response of the court:

In response to the inquiry as to whether or not the sums to which the bondholders are entitled under the opinion herein should bear interest, and if so, from what time, we are of opinion that, although the amount of the earnings was in dispute and the terms of the contract not altogether free from ambiguity, nevertheless, the sums due were fixed by a written contract, and the time of payment also fixed, and we perceive no reason why the earnings, as they are ascertained in the

approved report of the commissioner, should not bear interest from the time they should have been applied under the contract in payment of the interest on the bonds. If the commissioner has computed the earnings from too early a date, it is because the coupons on the bonds for such time had already been paid, and if so, such coupons were taken in by the railway company and will be admitted as credits on final hearing, which meets the suggestion of error in that particular made by counsel for the appellees.

The petition for rehearing is overruled.